## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA

**UNITED STATES OF AMERICA,**

       **Plaintiff,**

**v.**                                          **Case No. 8:09-CR-352-T-33MAP**

**BEN BANE,**

       **Defendant.**

_____/

## SENTENCING MEMORANDUM OF
## DEFENDANT BEN BANE

**James E. Felman, Florida Bar No. 775568**
**jfelman@kmf-law.com**
**Katherine Earle Yanes, Florida Bar No. 0159727**
**kyanes@kmf-law.com**
**KYNES, MARKMAN & FELMAN, P.A.**
**Post Office Box 3396**
**Tampa, FL 33601-3396**
**Telephone:**    **(813) 229-1118**
**Facsimile:**    **(813) 221-6750**

**Attorneys for Ben Bane**

# TABLE OF CONTENTS

I.  Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  The Application of 18 U.S.C. Section 3553(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.    Factor One:  The Nature and Circumstances of the Offense and the
           History and Characteristics of the Defendant . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

           1.    The Nature and Circumstances of the Offense . . . . . . . . . . . . . . . . . . . . 3

           2.    The History and Characteristics of the Defendant . . . . . . . . . . . . . . . . . . 5

    B.    Factor Two: The Purposes of Sentencing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

           1.    Just Punishment and Deterrence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

           2.    Protection of the Public and the Need for Rehabilitation . . . . . . . . . . . . . 9

    C.    Factor Three: The Kinds of Sentences Available . . . . . . . . . . . . . . . . . . . . . . . . 10

    D.    Factors Four and Five: The Sentencing Guidelines and Guideline Policy
           Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

           1.    Objections to the Proposed Application of the Sentencing Guidelines . . 10

                  a.    The Ex Post Facto Issue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

                  b.    The Calculation of Loss . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

                  c.    The Multiple Victim Adjustment . . . . . . . . . . . . . . . . . . . . . . . . 12

                  d.    The Sophisticated Means Adjustment . . . . . . . . . . . . . . . . . . . . . 13

                  e.    The Identity Theft Adjustment . . . . . . . . . . . . . . . . . . . . . . . . . . 16

           2.    The Advisory Guidelines Range Significantly Overstates the
               Seriousness of Mr. Bane's Offense . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

           3.    The Advisory Guidelines Range Overstates the Seriousness of the
               Offense Because of its Undue Reliance on Loss and Cumulative
               Specific Offense Characteristics . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

        4.      A Comparison of Sentences in Other Medicare Fraud Cases . . . . . . . . 26

E.     Factor Six: The Need to Avoid Unwarranted Disparities . . . . . . . . . . . . . . . . . . 31

F.     Factor Seven: The Need to Provide Restitution . . . . . . . . . . . . . . . . . . . . . . . . . 31

III.   Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

# TABLE OF AUTHORITIES

*Kimbrough v. United States*,
  552 U.S. 85 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*United States v. Adelson*,
  441 F.Supp.2d 506 (S.D.N.Y. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24,25

*United States v. Bailey*,
  123 F.3d 1381 (11th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*United States v. Bertoli*,
  40 F.3d  1384 (3d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*United States v. Booker*,
  543 U.S. 220 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*United States v. Cooper*,
  2006 WL 288704 (D. Kan. 1/24/06) (unpublished) . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Cutter*,
  313 F.3d 1 (1st Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*United States v. Emmenegger*,
  329 F.Supp.2d 416 (S.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*United States v. Ferguson*,
  No. 3:06-cr-00137-CFD (D. Conn. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*United States v. Hoffman-Vaile*,
  568 F.3d 1335 (11th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*United States v. Liss*,
  265 F.3d 1220 (11th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*United States v. Masood*,
  Case No. 09-20043-CR-AJ (S.D.Fl. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14-15

*United States v. Mendez*,
  420 Fed. Appx. 933, 2011 WL 1207601 (11th Cir. 2011) (unpublished) . . . . . . . . 15-16

*United States v. Ortland*,
  109 F.3d 539 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

iv

*United States v. Ovid*,
   Case No. 09-CR-216 (JG), 2010 WL 390724 (E.D.N.Y. 2010) . . . . . . . . . . . . . . . . . . . 26

*United States v. Parris*,
   573 F.Supp.2d 744 (E.D.N.Y. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*United States v. Robertson*,
   493 F.3d 1322 (11th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*United States v. Ruff*,
   420 F.3d 772 (8th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*United States v. Turkan*,
   No. 4:08-CR-428 DJS (E.D. Mo. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*United States v. Watt*,
   707 F.Supp.2d 149 (D. Mass. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

## I.      Introduction

Defendant Ben Bane submits this Memorandum with respect to the application of 18 U.S.C. Section 3553(a) to the facts and circumstances of his offense.  For the reasons reflected in the Memorandum and to be discussed at the sentencing hearing,[1] Mr. Bane respectfully submits that a sentence of four years (48 months) would be sufficient but not greater than necessary to achieve the purposes of sentencing.  This is particularly true in light of Mr. Bane's history and characteristics and the nature and circumstances of the offense.  The Memorandum also discusses the reasons that the advisory sentencing guidelines may significantly overstate the seriousness of Mr. Bane's offense, wholly fail to capture the mitigating aspects of both his personal history and characteristics as well as the nature and circumstances of his crime, and yield a sentencing range that greatly exceeds what is needed to satisfy the purposes of sentencing.  Mr. Bane's company provided medically necessary care to thousands of sick people and billed only for care actually provided.  The government suggests this Court should (1) calculate Mr. Bane's sentence as if he provided no care to anyone and that his thousands of patients did not exist (by using the allowed amount as loss); (2) then double that sentence based on the actual existence of the sick patients (by adding six levels for multiple victims); and then (3) order Mr. Bane to personally pay out of his pocket for the care he provided to these thousands of real patients not just once (by ordering forfeiture of the total amounts Medicare paid), but twice (by ordering restitution in addition to the forfeiture without regard to medical necessity).  The government's quadruple-overkill approach – with the clear effect of punishing Mr. Bane for the exercise of his Constitutional right to a jury trial, should be emphatically rejected.

---

[1]Mr. Bane anticipates presenting additional information to the Court at the sentencing hearing with a request that, in light of the nature of the information, it be heard by the Court *in camera*.

1

## II.   The Application of 18 U.S.C. Section 3553(a)

Pursuant to *United States v. Booker*, 543 U.S. 220, 259-60 (2005), the Court must consider

each of the Section 3553(a) factors in fashioning an appropriate sentence.  These factors are:

(1) the nature and circumstances of the offense and the history and characteristics of
the defendant;

(2) the need for the sentence imposed–

(A) to reflect the seriousness of the offense, to promote respect for
the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational
training, medical care, or other correctional treatment in the most
effective manner;

(3) the kinds of sentences available;

(4) [the applicable Sentencing Guidelines];

(5) any pertinent [Sentencing Guidelines] policy statement ...;

(6) the need to avoid unwarranted sentence disparities among defendants with similar
records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

Section 3553(a), "as modified by *Booker*, contains an overarching provision instructing

district courts to 'impose a sentence sufficient, but not greater than necessary' to accomplish the

goals of sentencing . . ." *Kimbrough v. United States*, 552 U.S. 85, 101 (2007).  Sentencing under

Section 3553(a) therefore requires the Court to start with the minimum sentence permissible and add

only so much additional punishment, if any, as is necessary to comply with Section 3553(a)'s

purposes.  As discussed below, application of the Section 3553(a) factors to Mr. Bane's case establishes that a sentence of four years is sufficient but not greater than necessary.

A.    **Factor One:  The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant**

1.    **The Nature and Circumstances of the Offense**[2]

This prosecution concerns the provision of oxygen and other durable medical equipment to Medicare patients who sought medical care from a physician because they were experiencing symptoms suggesting a need for medical care.  After a physical examination, the physicians believed the patients to have a possible medical need for oxygen, and referred them either to Bane Medical Services ("BMS") or to one of the laboratories conducting testing on patients referred to BMS to determine whether the patient qualified for oxygen at the expense of the Medicare program.  Thus, in contrast with some health care fraud offenses, in this case the patients were not "recruited" or even initially contacted by the defendant.  They were instead referred to the defendant's company by medical doctors who believed the patients likely needed the defendant's services based on the physician's independent examination of the patient and evaluation of the patient's medical history.

The applicable Medicare regulations required that an independent lab perform the test necessary to qualify a patient for oxygen to be provided at Medicare's expense by BMS.  The crux of the government's case was that these tests were performed in some instances by BMS employees rather than an independent lab.  This would render the claims submitted to Medicare by BMS fraudulent to the extent that they included physician certifications that the qualifying tests were performed by an independent lab where in truth they were not.  The possible mis-identification of

_____

[2]The factual statement below is taken from the proffer contained in Mr. Bane's Memorandum Regarding the Calculation of Loss, to which the government has stated no objection. Doc. 364.

3

the lab performing the qualifying tests did not, however, establish that the test results themselves were not accurate or that there was no medical necessity for the patient to receive oxygen from BMS. The tests were not difficult to administer, and the government offered no evidence that the test results were affected by the identity of the tester. The government did present evidence that the independent labs submitted bills for the tests even though they had not performed them.

Events following the alleged criminal activity at issue strongly suggest the medical necessity of the services provided by BMS. Shortly before the execution of the search warrants that signaled the initiation of this investigation, BMS was acquired by Lincare. After the execution of the warrants, Lincare was on notice that there could be irregularities in the qualification of the patients it had acquired from BMS and was currently servicing. Prior to submitting any claims to Medicare, Lincare performed due diligence and a statistical sampling of these patients in an effort to confirm the medical necessity of the oxygen it was providing to the former BMS patients. Lincare also corresponded with Medicare to advise Medicare regarding these issues and its intended efforts to address the situation. At no time did Medicare or any other government agency advise Lincare that any of the services it was providing to the patients acquired from BMS were not medically necessary or that any such patients needed to be re-tested to establish the medical necessity of Lincare's services. The result of this due diligence, statistical sampling, and correspondence with Medicare was that Lincare continued providing oxygen to each patient, billed Medicare for these services, and was paid for them by Medicare.

In addition to its primary theory of guilt regarding the mis-identification of the testing labs, the government also offered evidence at trial that some of the test results by BMS employees had been falsified to show a qualifying result. Not more than 55 of these potentially fake test results,

4

however, were used to seek reimbursement from Medicare.  The government also offered evidence at trial that the tests given to some of the patients were "overnight" tests – used to qualify a patient only for stationary oxygen – but were submitted to Medicare as "at rest" tests and used to qualify the patient for both stationary and portable oxygen.  Medicare pays roughly $30 dollars per month more for portable oxygen.  The government has not offered evidence as to how many of these patients would or would not have qualified for portable oxygen had they been given "at rest" tests. Moreover, the vast majority of these patients suffered from Chronic Pulmonary Obstruction Disease ("COPD"), which is an incurable and progressive disease.  This means that even patients who did not qualify for portable oxygen when they first needed stationary oxygen would almost certainly have needed and qualified for portable oxygen at a later point in time.

### 2.    The History and Characteristics of the Defendant

Mr. Bane's story is a compelling example of a struggle to overcome economic and social adversity resulting in significant success through pure force of human effort.  Mr. Bane was born in poverty on September 16, 1946, in Tampa, Florida, the third of seven children.  His father had a third grade education and worked all his adult life for Lykes Brothers Meat Packing Plant.  His mother had an eighth grade education, and worked as a manual laborer on farms.  Because the family was so impoverished, all of the children had to work from an early age.  Mr. Bane attended elementary school only during the Summer so that he could work full time on strawberry farms during the Winter.  This continued until Mr. Bane entered the seventh grade, when he picked strawberries only on week-ends and before school during the school year and then worked in peanut fields nine to ten hours a day during the Summers.  The family moved numerous times during Mr.

Bane's childhood, sometimes spending less than a year in a place.   They lived in shacks most of the time.

Besides crushing poverty and constant manual labor, Mr. Bane's childhood was especially traumatic because his father was a violent alcoholic.   Prior to Mr. Bane's birth his father was convicted of murder for killing a man in a bar with a knife.   The father's violence was frequently directed at his wife and sons.   Mr. Bane remembers numerous times as a child watching his father come home drunk and his mother hiding under the bed until he passed out or went to sleep.   Mr. Bane's father began to beat him as well following an incident when he inadvertently caught his father engaged in sexual relations with a neighbor.   Mr. Bane ran home and told his mother what he had seen, and his father followed him home soon after and got into a fight with Mr. Bane's mother and started beating her.   Mr. Bane screamed at him to stop hitting his mother but he would not.   Mr. Bane grabbed an ice pick and threatened his father with it but still he would not stop beating his wife.   Mr. Bane then threw the ice pick at his father and hit him in the head with it just above his eye.   Consequently, his father quit beating his mother and started beating him.   This became a frequent event in which Mr. Bane's father often used a belt or a stick that caused Mr. Bane to bleed.   After such beatings, the father would lock Mr. Bane in a room and not allow him to come out until the next day.   Upon coming out, his clothes often had to be cut off because they would have stuck to his body from the wet blood that dried and clung to his skin.   This continued with frequency until 1963, when Mr. Bane was sixteen years old, and he decided to leave home.   At first, Mr. Bane lived with one of his friends, and then, when his sister Marie got married, he went to live with them.

Mr. Bane graduated from Turkey Creek High School in 1965 and immediately enlisted in the United States Air Force.   Mr. Bane completed two tours of duty in Vietnam engaged in active

combat service. When Mr. Bane returned to the United States in 1969 he was admitted to a psychiatric hospital in Texas for several months, after which he was honorably discharged. He returned to Florida to live with his sister Marie and her husband, and studied one year at Lake City Junior College and Forest Rangers School. When Mr. Bane's first wife, Karen Ford, got pregnant they both quit college and started working – Mr. Bane installing phone equipment, and Karen in Marie's husband's company. Their son, Gregory, was born in 1971.

After working in a bank for a while, Mr. Bane returned to Lake City Junior College. He earned an Associate of Arts degree in 1972 and a Bachelors degree in psychology in 1973. They then moved to Valdosta, Georgia, where Karen returned to college and Mr. Bane worked as a bill collector during the day while taking additional college classes in the evenings. In 1976, both he and his wife graduated with master's degrees in sociology from Valdosta State College. The couple then moved to Jesup, Georgia, where Karen got a job as director of a school for handicapped children, and Mr. Bane volunteered as a teacher at the school. One year later, they moved to Ocala, Florida, where Mr. Bane worked as a counselor and teacher for the state juvenile detention center. In 1978, Mr. Bane moved back to the Tampa area where he worked counseling kids in the "Learning Alternative Program" at the Tomlin Junior High School in Plant City.

Mr. Bane and Karen divorced in 1981, and thereafter he met Kathe Bush, whom he married in 1985 in Plant City, Florida. In 1984, after working at Saron – a pharmaceutical company in St Petersburg – Mr. Bane decided to start his own oxygen business. Mr. Bane operated the company alone for three years, and then slowly and steadily built the company through long hours of tireless effort. Having started literally from scratch, by 1995 Mr. Bane had built his company to the point

that he was able to sell it to Lincare for fifteen million dollars.  He also divorced from Kathe that same year, and she was awarded a substantial portion of the Lincare sales proceeds in the divorce.

From 1996 to 1999, Mr. Bane worked as a consultant in the oxygen industry, and then returned to the Bay area in 2000 when he took over BMS from his son.[3]  As with his first oxygen business, Mr. Bane oversaw the growth of BMS through long hours of personal toil and hard work. By 2004 Mr. Bane had grown BMS such that Lincare agreed to purchase it from him for twenty-one million dollars.[4]

Mr. Bane's history and characteristics do not reflect a need for harsh punishment or continued incarceration.  He has been a productive member of the community who went to work as a child to help support his family and has consistently been either enrolled in higher education or employed throughout his adult life.  He built two different oxygen companies from scratch, providing stable employment for dozens of employees and needed oxygen and other medical services for thousands of people suffering from illness.  The nature and circumstances of the offense similarly do not demonstrate a need for extended incarceration.  While the Medicare regulation requiring qualifying testing by an independent lab was frustrated here, the funds paid to BMS by Medicare were for services that were both medically necessary and actually provided.  The case bears no resemblance to the typical Medicare fraud case, in which bills are submitted and funds essentially stolen for services that were either medically unnecessary or never even provided at all.

---

[3]Mr. Bane also acquired ORT at this time.  The two companies are referred to collectively in this Memorandum as "BMS."

[4]As a result of litigation Lincare only paid Mr. Bane $19 million of the agreed-upon price, and Mr. Bane paid income taxes on those proceeds, leaving him with a net payment of approximately $13 million.

In light of both Mr. Bane's history and characteristics as well as the nature and circumstances of the alleged offense, a sentence of four years would fulfill the statutory purposes of sentencing.

### B.   Factor Two: The Purposes of Sentencing

Section 3553(a)(2) lists four purposes of sentencing, which can be summed up as: (1) just punishment; (2) deterrence; (3) protection of the public; and (4) rehabilitation. Under the parsimony principle, the sentence should be the minimum necessary to accomplish these purposes.

### 1.   Just Punishment and Deterrence

A sentence of four years is a just punishment for this offense and would adequately deter Mr. Bane and others in the future. Mr. Bane is 64 years old, and would be nearly 70 upon release from a four-year sentence, assuming he lives that long. Given his age, a sentence of four years will certainly represent a significant percentage of Mr. Bane's remaining life, if not the entirety of it.

### 2.   Protection of the Public and the Need for Rehabilitation

As to protecting the public and the need for rehabilitation, the facts of this offense as well as Mr. Bane's personal characteristics place him at low risk to re-offend. The offense was a product of conditions that will not recur in the future. To put it charitably, it is exceedingly unlikely that Mr. Bane will ever again find himself in a position to bill Medicare. He will have lost his reputation forever and will be a convicted felon. The circumstances of his offense strongly suggest that Mr. Bane does not require further incarceration to prevent him from committing another offense.

Beyond the fact that Mr. Bane will not likely be in a business position to re-offend, his age and personal characteristics also suggest that the safety of the public does not require his continued incarceration. He has little criminal history – none in the last fifteen years – stands convicted of a non-violent offense, is sixty-four years old, has a strong and stable employment history, completed

college, and has a strong network of supportive friends and family.  Considering the circumstances of Mr. Bane's alleged crime, his age, and his limited criminal history, he presents a very low risk of recidivism.  Further incarceration of Mr. Bane is not necessary for the protection of the public.

**C.      Factor Three: The Kinds of Sentences Available**

This Court has at its disposal every sentencing option in framing a just sentence for Mr. Bane.  A sentence of four years, followed by a period of supervised release, is a variety of sentence available to the Court.

**D.      Factors Four and Five: The Sentencing Guidelines and Guideline Policy Statements**

**1.      Objections to the Proposed Application of the Sentencing Guidelines**

*a.      The Ex Post Facto Issue*

The offense conduct is alleged to have spanned from January 2001 to December 2004.  The PSR proposes the application of the 2010 guideline manual, including numerous amendments made to the manual in 2001 and 2003 that potentially increased the applicable guidelines score.  These changes included a six-level increase in the applicable portion of the loss table, the six-level increase for more than 250 victims, as well as the two-level increase for identity theft – a combined fourteen-level impact.  Thus, under the 2000 guidelines manual in effect at the time of the beginning of Mr. Bane's alleged offense, the offense level would be no higher than 28 (base offense level of 6, plus 14 for loss, plus 2 for more than minimal planning or multiple victims, plus 4 for role, plus 2 for obstruction) with a corresponding sentencing range of 78 to 97 months.  Use of the 2010 Guidelines exposes Mr. Bane to a sentencing range of 360 months to life imprisonment – a dramatic increase over the 2000 guidelines in effect during a significant portion of Mr.Bane's alleged offense conduct.

10

Section 1B1.11 of the guidelines contains the so-called "one book rule," under which the version of the guidelines in effect at the end of a defendant's offense may be applied to conduct that predates intervening increases in the guidelines. The Third and Ninth Circuits have held that this use of the one-book rule in cases involving conduct both before and after the effective date of adverse amendments to the guidelines violates the ex post facto clause. *United States v. Ortland*, 109 F.3d 539, 547 (9th Cir. 1997); *United States v. Bertoli*, 40 F.3d 1384, 1404 n.17 (3d Cir. 1994). Mr. Bane thus objects to the use of the 2010 guidelines manual with respect to any of his offense conduct prior to November 1, 2001. This Court is not free to rule in favor of Mr. Bane on this issue, however, as the Eleventh Circuit rejected this argument in *United States v. Bailey*, 123 F.3d 1381, 1404-05 (11th Cir. 1997). Mr. Bane preserves the issue here for potential appellate review or collateral attack.

### b.    The Calculation of Loss

The parties have submitted Memoranda to the Court regarding the legal standard applicable to the calculation of loss. *See* doc. 363, 364, 369, 370. Depending on the resolution of that issue, the loss could range from practically zero, as Mr. Bane contends given Medicare's continued payment for all BMS patients after their acquisition by Lincare, to $8.4 million, as asserted by the government. The Court has indicated to the parties an intention to adopt the government's position regarding the applicable legal standard on the theory that this result is inherent in the verdict and that this case is governed by Application Note 3(F)(v) to Section 2B1.1 of the guidelines because the case involves "goods for which regulatory approval by a government agency was required." Accordingly, the Court appears prepared to rule that a twenty-level upward adjustment to Mr. Bane's base offense level is appropriate to reflect an intended loss of roughly $8.4 million based on

the amounts Medicare "allowed" on the claims submitted.[5]  Mr. Bane objects to this ruling for the

reasons stated in his previous memoranda.[6]

c.    *The Multiple Victim Adjustment*

As noted above, the Court intends to calculate "loss" in the same manner it would if Mr.

Bane had *never had an oxygen company* and as if the thousands of sick patients his company

serviced *did not exist*.  In an ironic twist adding insult to injury, the PSR then proposes to effectively

*double* Mr. Bane's sentence because his patients actually *did* exist, but should be considered

"victims."

To be a victim, a person must have suffered a "part of the actual loss" determined under the

guidelines. U.S.S.G. § 2B1.1, App. Note 1.  Not one of the five co-defendants sentenced to date has

received any victim-related adjustment.  For Mr. Bane, however, the PSR proposes a six-level

upward adjustment for more than 250 victims (159 individual patients and 51 supplemental private

insurance carriers) based on the theory that any amounts they paid for services rendered by BMS

are "loss" without regard to medical necessity.  Many of these "victim" "losses" are less than

$25.00, including one victim with a proposed "loss" of one penny.

---

[5]Medicare only pays 80 percent of the allowed amount, and Mr. Bane at all times understood this.  The government evidently asserts that the remaining 20 percent of the allowed amount was intended by Mr. Bane to be loss to private insurance companies and individuals.

[6]Mr. Bane also objects to the proposed two-level upward adjustment for obstruction of justice, but in light of the volume of proposed obstructive testimony suggested by the government, *see* doc.393, Mr. Bane will present this objection in the course of the sentencing hearing.  In light of the jury's verdict, Mr. Bane does not object to the proposed role adjustment, although for the reasons set forth below it contributes to a guidelines score that significantly overstates the seriousness of Mr. Bane's offense.

12

Mr. Bane objects to this proposed application of the guidelines for a number of reasons. First, as noted, this adjustment was not applied to any of Mr. Bane's co-defendants. It is plainly unfair to apply such an adjustment only to him. Second, neither the private insurance companies nor any private individuals premised their payments on any representations concerning the independence of the labs performing the qualifying tests. Thus, neither the private companies nor the individual patients were victims of the charged fraud or any other crime committed by the defendant. Third, neither category of private entity suffered any loss from the offense because the services they paid for were medically necessary and actually provided by the defendant's company. Simply stated, only those individuals and insurance carriers who paid for services that were either medically unnecessary or fictitious should be counted as victims. This number may well be zero. Fourth, there are not 250 victims even using the approach taken by the PSR because it treats each supplemental insurance carrier as a separate victim as to each of its patients. Thus, rather than count the 51 various supplemental private entities as 51 victims, the PSR instead proposes to count them as 109 victims based on the number of patient files at issue. Even deploying the flawed reasoning of the PSR in which sick people who got the medicine they needed and they or their carrier payed only for the medicine they got are declared "victims," the number of such "victims" is less than 250.

d.      *The Sophisticated Means Adjustment*

The PSR proposes yet another two-level upward adjustment under Section 2B1.1(b)(9) of the guidelines on the theory that "the offense involved sophisticated means." The term "sophisticated means" is defined to mean "especially intricate offense conduct pertaining to the execution or concealment of an offense. ... Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily

13

indicates sophisticated means." *Id.*, App. Note 8(B).  The applicability of this adjustment turns on the offense conduct as a whole and not the conduct of any one criminal participant. *See* U.S.S.G. § 1B1.1, App. Note 1(H) ("'Offense' means the offense of conviction and all relevant conduct under § 1B1.3 (Relevant Conduct) unless a different meaning is specified or is otherwise clear from the context.").

Mr. Bane objects to this proposed application of the guidelines for several reasons.  First, as noted, this adjustment was not applied to any of Mr. Bane's co-defendants.  It is plainly unfair to apply such an adjustment only to him.  Second, the enhancement is inapplicable because this offense did not involve sophisticated means.  Viewing the evidence in the light most favorable to the verdict, the defendants committed fraud by submitting claims to Medicare that mis-identified the labs conducting qualifying tests.  There was nothing particularly sophisticated about this.  The case does not involve any of the examples of sophisticated means listed in the guidelines – hiding assets or transactions, fictitious entities, corporate shells, or offshore financial accounts.  All claims were submitted by BMS on behalf of BMS for services performed by BMS for payment to BMS at accounts in the name of BMS using the Medicare provider number assigned to BMS.

The sophisticated means enhancement should be rejected here for the same reasons it was rejected by Judge Adalberto Jordan in *United States v. Masood*, Case No. 09-20043-CR-AJ (S.D.Fl. 2009) (Sentencing transcript attached hereto as Exhibit 1).  As Judge Jordan observed,

> in every Medicare fraud scheme that is successful in any way, the fraudsters are a step ahead of the game.  And they're always trying to do something that Medicare can't catch, or at least not catch quickly enough.  And so it seems to me – every fraud scheme by its very nature requires deception.  But the sophisticated means enhancement, according to the commentary, Section 2B1.1(b)(9)(C), the commentary says that "it pertains to a specially complex or specially intricate offense conduct pertaining to the execution or concealment of the offense."

14

> I mean every Medicare fraud scheme requires lying and deception; otherwise the scheme couldn't possibly work, or at least even try to work. So, people are always lying to Medicare and to regulators to get the scheme going. That's why they are convicted of Medicare Fraud.
>
> * * *
>
> I'm not sure the scale of the fraud in this case is a factor that really goes into the sophisticated means enhancement or is very significant, if it's relevant at all.
>
> You can have a relatively small scheme that uses sophisticated means or a very large one that does not. And fraud and deception is inherent in any Medicare fraud scheme.
>
> And with regards to the use of the billing codes, I think that's just part of the fraud. That's the way this fraud worked in that the billing codes were used to try to stay a step ahead of Medicare. But it doesn't seem to me that that is especially intricate or complex.

Ex. A at 10-11; 15. *See also United States v. Cooper*, 2006 WL 288704 (D. Kan. 1/24/06) (unpublished) (rejecting sophisticated means enhancement in Medicare fraud sentencing).

This case bears no resemblance to the unpublished Eleventh Circuit case cited by the Probation Officer in his Addendum, *United States v. Mendez*, 420 Fed. Appx. 933, 2011 WL 1207601 (11th Cir. 2011) (unpublished). Mendez used multiple shell companies both to distribute the nearly $11,000,000 in proceeds of the offense to his co-conspirators as well as to move large amounts of money offshore. Notwithstanding this the government argued in the district court that the enhancement did not apply. Indeed, although the Eleventh Circuit affirmed the use of the enhancement, it described the issue as a "very close question" and noted that "in each case in which we have upheld the application of a sophisticated-means enhancement, the defendant used false identities, fraudulent accounts, or fictitious entities to conceal his participation in the scheme or to execute and conceal the fraudulent transactions." *Id.* at **5. *Mendez* thus reaffirms that it would be error to apply the enhancement here because no such factors are present.

15

e.     *The Identity Theft Adjustment*

Although this is a Medicare fraud case rather than an identity theft case, and although not one of the five co-defendants previously sentence received such an enhancement, the PSR proposes a further two-level upward adjustment for identity theft for Mr. Bane pursuant to U.S.S.G. Section 2B1.1(b)(10).  The basis for this adjustment appears to be that one doctor's signature on one CMN was forged.  There is no evidence this was directed by, known, or reasonably foreseeable to Mr. Bane.  All of the claims submitted for the roughly 3,000 patients of Mr. Bane's company properly identified the doctors and patients for whom the claims were submitted.  The government's effort to impose an across-the-board two-level upward adjustment for all claims based on the single instance of forgery unconnected to the defendant should be rejected as without legal or factual basis.

**2.     The Advisory Guidelines Range Significantly Overstates the Seriousness of Mr. Bane's Offense**

Assuming for the sake of argument that Mr. Bane's objections to the multiple victim, sophisticated means, and identity theft adjustments are overruled, the guideline sentencing range proposed by the PSR is the following:

| | |
|---|---|
| Base Offense Level | 6 |
| Specific Offense Characteristic (Loss > $7.5 million) | +20 |
| Multiple victims | +6 |
| Sophisticated means | +2 |
| Identity Theft | +2 |
| Role in the offense | +4 |
| Obstruction of justice | +2 |
| Adjusted offense level | 42 |

An offense level 42 (at Mr. Bane's criminal History Category I) corresponds to a sentencing range of 360 months to life.  This range is unreasonably harsh in light of the full nature and circumstances of the offense as well Mr. Bane's history and characteristics.  Indeed, the excessive nature of this

16

range is particularly evident when comparing it to other offenses considered serious enough by the

Commission to warrant offense levels at or near 42:

| Crime | Offense Level | Guideline |
|---|---|---|
| First degree murder | 43 | 2A1.1(a) |
| Attempted murder for hire where the object of the offense would have constituted first degree murder, the victim sustained permanent or life threatening bodily injury | 41 | 2A2.1(a)(1) |
| Criminal sexual abuse of a child under 12 years old by force, threat of death, or rendering the victim unconscious by force or drugs | 42 | 2A3.1(a)(1) |
| Kidnapping where the victim was both sexually exploited and sustained a permanent or life-threatening injury | 42 | 2A4.1(a) |
| Aircraft piracy resulting in death | 43 | 2A5.1(b)(1) |
| Aircraft piracy not resulting in death | 38 | 2A5.1(a) |
| Wire fraud causing a loss of an unlimited amount of money in excess of $400,000,000 without other aggravating characteristics | 37 | 2B1.1 |
| Robbery with discharge of firearm causing permanent or life-threatening injury and a loss of more than $5,000,000 | 40 | 2B3.1 |
| Counterfeiting more than $400,000,000 of United States currency | 39 | 2B5.1 |
| Distribution of an unlimited amount of every type of unlawful drug | 38 | 2D1.1 |
| Sex trafficking of children under the age of twelve by means of force | 42 | 2G1.3(a)(1) |
| Production of sadistic and masochistic pornography involving children under the age of twelve | 40 | 2G2.1 |

17

| | | |
|---|---|---|
| Selling or buying children for use in the production of pornography | 38 | 2G2.3 |
| Distribution of an unlimited number of every type of unlawful firearm | 34 | 2K2.1 |
| Treason tantamount to waging war against the United States | 43 | 2M1.1 |
| Gathering and transmitting top secret national defense information to aid a foreign government | 42 | 2M3.1 |
| Unlawful activity involving nuclear weapons and biological or chemical weapons of mass destruction with intent either to injure the United States or to aid a foreign terrorist organization | 42 | 2M6.1 |
| Continuous tampering with a public water system causing permanent or life-threatening injury to an unlimited number of people | 37 | 2Q1.4 |
| Willful evasion of more than $400,000,000 of income tax | 36 | 2T1.1(a)(1) |

It would be nothing short of ludicrous to compare Mr. Bane's conduct with crimes such as first degree murder, providing nuclear and biological weapons of mass destruction to foreign terrorist organizations, the distribution of unlimited amounts of illegal drugs and guns, or other economic crimes causing unlimited amounts of harm in excess of $400,000,000. Indeed, if the Court were to reject the proposed upward adjustments for multiple victims, sophisticated means, and identity theft, and calculate Mr. Bane's guidelines as level 32, even this range significantly overstates the seriousness of Mr. Bane's conduct when comparing it to other offenses considered serious enough by the Commission to warrant offense levels at or near 32:

18

| Crime | Offense Level | Guideline |
|---|---|---|
| Voluntary manslaughter | 29 | 2A1.3(a) |
| Conspiracy or solicitation to commit murder | 33 | 2A1.5(a) |
| Assault with intent to commit murder; attempted murder where the object of the offense would have constituted first degree murder | 33 | 2A2.1(a)(1) |
| Aggravated assault involving more than minimal planning, discharge of a firearm, permanent or life-threatening bodily injury motivated by a payment of money in violation of a court protection order | 30 | 2A2.2 |
| Criminal sexual abuse of a child under 12 years old | 34 | 2A3.1 |
| Kidnaping | 32 | 2A4.1(a) |
| Interference with a flight crew member intentionally endangering the safety of an airport or aircraft while brandishing a dangerous weapon | 33 | 2A5.2 |
| Wire fraud causing a loss between $100,000,000 and $200,000,000 without other aggravating role or specific offense characteristics | 33 | 2B1.1 |
| Robbery involving the discharge of a firearm causing permanent or life-threatening bodily injury and loss of between $50,000 and $250,000 | 33 | 2B3.1(a), (b) |
| Extortion by force involving the discharge of a firearm causing permanent or life-threatening bodily injury and abduction to facilitate escape | 33 | 2B3.2(a), (b) |
| Bribery of a bank officer with improper benefit between $20,000,000 and $50,000,000 that substantially jeopardized the safety and soundness of a financial institution | 34 | 2B4.1(a), (b) |
| Bribery of a public official to receive improper benefit between $7,000,000 and $20,000,000 | 34 | 2C1.1 |

19

| | | |
|---|---|---|
| Use of interstate commerce facilities in the commission of murder-for-hire | 32 | 2E1.4(a)(1) |
| Sex trafficking of children or by force, fraud, or coercion | 34 | 2G1.1(a)(1) |
| Holding a person in a condition of involuntary servitude for more than a year where a dangerous weapon was used and victim sustained permanent or life-threatening injury | 33 | 2H4.1(a), (b) |
| Trafficking in an unlimited number of semiautomatic firearms capable of accepting large capacity magazines | 34 | 2K2.1 |
| Smuggling an unlimited number of inadmissible aliens into the United States | 34 | 2L1.1 |
| Destruction of war material with intent to injure the United States or aid a foreign nation | 32 | 2M2.1(a) |
| Unauthorized disclosure to a foreign government of classified top secret information by a public employee | 29 | 2M3.3(a)(1) |
| Providing firearms and explosives to a foreign terrorist organization with the intent that they be used to commit a violent act | 28 | 2M5.3(a), (b) |
| Unauthorized acquisition of and threat to use nuclear and biological weapons and other weapons of mass destruction | 30 | 2M6.1 |
| Tampering with consumer products causing permanent or life-threatening injury to an unlimited number of victims | 29 | 2N1.1 |
| Tampering with a public water system causing permanent or life-threatening injury to multiple victims | 30 | 2Q1.4 |
| Antitrust violations involving an unlimited amount of commerce | 28 | 2R1.1 |
| Willful evasion of between $100,000,000 and $200,000,000 of personal income tax | 32 | 2T4.1 |

Mr. Bane's offense cannot in fairness be considered comparable to these other offenses with offense levels at or near offense level 32. There is nothing about this case which serves to justify

treating it on a par with offenses such as conspiracy to commit murder, sexual battery of young children, kidnaping, large scale arms trafficking, espionage, or stealing and threatening to use an atomic bomb. The guideline score for Mr. Bane's offense would dramatically overstate its seriousness even if the Court rejects the proposed adjustments for multiple victims, sophisticated means, and identity theft.

### 3. The Advisory Guidelines Range Overstates the Seriousness of the Offense Because of its Undue Reliance on Loss and Cumulative Specific Offense Characteristics

The principal reason the advisory guidelines range overstates the seriousness of Mr. Bane's offense is the guidelines' undue reliance on loss as a sentencing factor, especially where as here the loss was purely "intended" and the defendant actually provided the medically necessary services he was paid for. The guidelines have significantly increased the weight afforded to loss over the years, in each instance without empirical basis.[7] Viewed over the life of the guidelines, the changes are dramatic. The 1987 version of the guidelines would have scored Mr. Bane's offense at level 28, with a corresponding sentencing range of 78 to 97 months. As noted above, the proposed offense level 42 under the current guidelines yields a range of 360 months to life. No empirical evidence supports the more than quadrupling of Mr. Bane's sentencing range.

The present guideline range reflects a relentless upward ratchet that began with the first set of Guidelines in 1987. Whereas the initial Commission had matched the penalties for most offenses with pre-Guidelines practice, it specifically did not to do so for economic crimes, and increased their penalties over the pre-Guidelines practices of the judiciary. U.S.S.G. ch. 1 pt. A. While citing no

---

[7]*See, e.g.,* Alan Ellis, John Steer, & Mark Allenbaugh, *Federal Sentencing for Economic Offenses*, 25:4 CRIM. JUST. 34 (2011); James E. Felman, *The Need to Reform the Federal Sentencing Guidelines for High-Loss Economic Crimes*, 23:2 FED. SENT. RPTR. 138 (2010).

data demonstrating that these initial increased penalties were inadequate, the Commission again raised the penalties for economic crimes through a new loss table in 1989. U.S.S.G. app. C, amends. 99, 154 (1989).  The Commission added numerous aggravating specific offense characteristics related to economic crimes from 1989 to 2001, U.S.S.G. app. C, amend. 317 (1990); amend. 551 (1997); amend. 576 (1997); amend. 596 (2000), when it again adopted wholesale increases through yet another new loss table. U.S.S.G. app. C, amend. 617 (2001).  These increases were then followed by the politically charged Sarbannes-Oxley Act, which led the Commission to increase the penalties for economic crimes yet again in 2003. U.S.S.G. app. C, amends. 647, 653 (2003).  As exemplified by Mr. Bane's case, the impact of these repeated changes is extreme.  In the initial 1987 guidelines, the amount of the loss could result in no more than a five-fold increase in the range of imprisonment. Under the current guidelines the loss can increase the range nearly forty-fold.

To be sure, loss has a place in measuring the culpability of an offense as it reflects the harm inflicted.  But the present guideline exaggerates that factor.  Putting role in the offense and possible obstruction to one side, even assuming application of the multiple victim, sophisticated means, and identity theft enhancements, Mr. Bane's guidelines without consideration of loss would be at offense level 16, with a corresponding sentencing range of 21 to 27 months.  Applying the twenty-level loss adjustment effectively multiplies that range by a factor of nearly ten.  It is respectfully submitted that there is nothing so peculiarly striking about Medicare's payments in this case (for services it would have paid for anyway even if Mr. Bane's company had never existed) that makes it either necessary or just to multiply Mr. Bane's sentence by a factor of ten.

Similarly, the multiple proposed specific offense characteristics combine to overstate the seriousness of Mr. Bane's offense.  Again putting possible obstruction aside and looking solely at

the loss, Mr. Bane's guidelines would be a level 26 (6 + 20), with a corresponding sentencing range of 63 to 78 months. The PSR proposes an fourteen-level increase based on multiple victims, sophisticated means, so-called "identity theft," and the fact that other employees were used to commit the offense. This proposed fourteen-level increase moves the applicable sentencing range from 63 to 78 months to 292 to 365 months. Mr. Bane does not dispute that the degree of sophistication, the number of victims, and the involvement of others are relevant sentencing considerations. But the circumstances of this offense, the identification of real sick patients who received needed treatments as "victims," and the involvement of BMS employees can hardly justify multiplying the number of months Mr. Bane spends in a prison cell by a factor of nearly five. Indeed, these factors do not justify increasing Mr. Bane's sentence *at all*. If Mr. Bane had had no oxygen company, had not provided a single tank of oxygen to even one sick patient, and had simply sat in his basement and submitted bills to Medicare for nothing and stolen all the money he received, his guidelines score would be *at least twelve levels lower* than that proposed by the government. Thus, the loss as well as the various other proposed specific offense characteristics act in concert to drive a guidelines range that significantly overstates the seriousness of this offense.

Numerous courts have recognized that loss in a fraud case, like quantity in a drug case, is not always an appropriate proxy for culpability. Loss, alone and in combination with various cumulative specific offense characteristics, can yield guideline ranges that significantly overstate a defendant's culpability. As described by Judge Gerard Lynch prior to his appointment to the Second Circuit:

> The Guidelines place undue weight on the amount of loss involved in the fraud. This is certainly a relevant sentencing factor: All else being equal, large thefts damage society more than small ones, create a greater temptation for potential offenders, and thus generally require greater deterrence and more serious punishment. But the

guidelines provisions for theft and fraud place excessive weight on this single factor, attempting – no doubt in an effort to fit the infinite variations on the theme of greed into a limited set of narrow sentencing boxes – to assign precise weights to the theft of different dollar amounts.  In many cases ... the amount stolen is a relatively weak indicator of the moral seriousness of the offense or the need for deterrence.

*United States v. Emmenegger*, 329 F.Supp.2d 416, 427 (S.D.N.Y. 2004).

In *United States v. Adelson*, 441 F.Supp.2d 506, 507 (S.D.N.Y. 2006), Judge Rakoff was confronted with a defendant convicted of joining a conspiracy to materially overstate a public company's financial results and thereby artificially inflate the price of its stock.  Adelson's guidelines score was level 46 – three levels "off the chart" – and called for a sentence of life imprisonment.  Even the government "blinked at this barbarity," but was unable to make a specific sentencing recommendation. *Id*. at 511-13.  For Judge Rakoff, this circumstance exposed "the utter travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense." *Id*. at 512.  Given that Adelson had not originated the fraud, presented an "exemplary" past history, and appeared "extremely unlikely" to recidivate, and coupled with the "considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders," the court sentenced Adelson to three-and-a-half years' imprisonment and ordered restitution in the amount of $50 million. *Id*. at 514-15.  Judge Rakoff explained that he had jettisoned the advisory guidelines range because "the calculations under the guidelines have so run amok that they are patently absurd on their face." *Id*. at 515.

In *United States v. Parris*, 573 F.Supp.2d 744, 745 (E.D.N.Y. 2008), Judge Block sentenced two defendants to five years' imprisonment "in the face of an advisory guideline range of 360 to life."  The offense – a "pump and dump" stock manipulation scheme – scored an offense level 42

24

based on upward adjustments for more that $2.5 million of loss, more than 250 victims, sophisticated means, officer/director status, role in the offense, and obstruction of justice. *Id*. at 747-48. Quoting Judge Rakoff in *Adelson*, Judge Block described this guidelines scoring as the "kind of 'piling-on' of points for which the guidelines have frequently been criticized." *Id*. at 745 (*quoting Adelson*, 441 F.Supp.2d at 510). The court noted that there were no valid grounds for downward departure from the guidelines and thus, but for their advisory status, it "would have been confronted with the prospect of having to impose what I believe any rational jurist would consider to be a draconian sentence." *Id*. at 750-51. Even the government agreed that "many reasonable sentences would fall outside" the advisory guidelines range. *Id*. at 751. In fashioning a reasonable sentence, the court stated it "would have much preferred a sensible guideline range to give me some semblance of real guidance." The court found no such help in the present guidelines, observing that "we now have an advisory guidelines regime where, as reflected by this case, any officer or director of virtually any public corporation who has committed securities fraud will be confronted with a guidelines calculation either calling for or approaching lifetime imprisonment." Instead of being guided by the guidelines, the Court instead assembled a lengthy compendium based on submissions from the parties listing sentences in other high-loss cases. *Id*. at 756-63. The compendium includes 34 cases with loss amounts ranging from $6 million to $14 billion and sentences ranging from probation to 25 years' imprisonment. After a lengthy discussion of what is essentially an emerging common law of high-loss economic crime sentences, the Court concluded that a sentence of five years' imprisonment was sufficient to achieve the purposes of sentencing. *Id*.

A number of similar cases did not result in published decisions. In *United States v. Ovid*, Case No. 09-CR-216 (JG), 2010 WL 390724 (E.D.N.Y. 2010), the defendant faced an advisory

guidelines range of 210 to 262 months, but the district court imposed a sentence of 60 months (with the agreement of the government). In *United States v. Ferguson*, No. 3:06-cr-00137-CFD (D. Conn. 2009), sentences ranging from one year and one day to four years were imposed on five defendants whose guideline ranges included the possibility of life imprisonment and who were convicted of fraud leading to over $500 million in loss. A defendant who caused approximately $25 million in losses was sentenced to one year and one day in *United States v. Turkan*, No. 4:08-CR-428 DJS (E.D. Mo. 2009). In each of these cases the courts found significant mitigating circumstances not otherwise taken into consideration by the guidelines. Given that all of the BMS patients received the treatments they needed and for which Medicare paid, this case similarly presents significant mitigating circumstances not otherwise taken into consideration by the guidelines.

### 4.     A Comparison of Sentences in Other Medicare Fraud Cases

The Court has indicated to the parties that it will likely impose a sentence that is below the applicable guideline range. This is without question correct. The Court is thus confronted with the further question of determining what sentence would be reasonable in light of all of the 3553(a) factors. On this point, the guidelines as calculated above are, to quote Judge Nancy Gertner of the District of Massachusetts, "of no help." *United States v. Watt*, 707 F. Supp.2d 149, 151 (D. Mass. 2010). Another means of approaching the question of a reasonable sentence would be to consider the sentences imposed in other similar Medicare fraud cases. This approach demonstrates that the 48-month sentence requested here is reasonable, and that any significantly higher sentence would be unreasonable.

Undersigned counsel have attempted to provide the Court with as much information as could readily be assembled regarding sentences in health care fraud prosecutions. Counsel began by

26

locating sentencing information regarding as many post-*Booker* health care fraud prosecutions as possible.[8]  Counsel narrowed the results to include only cases involving defendants who had not provided substantial assistance to the government and had a significant leadership role in the fraud, such as a physician or the owner or operator of a company providing health care services. Information was gathered regarding the loss amount,[9] the defendant's position, the practice area involved, and the nature of the offense.  Additionally, where information was available regarding other factors that appeared likely to have affected the sentence, that information was noted.  A spreadsheet containing this information is attached as Exhibit 2, and a reference list reflecting the sources of the information in each line of the spreadsheet and providing a key to abbreviations used in the spreadsheet is attached as Exhibit 3.

Before discussing the results of this survey of other cases, it bears noting at the outset that not one of the other cases found resembles this one.  Unlike this case, the other cases located by undersigned counsel involved frauds where the vast majority of the goods or services at issue were either not provided or not medically necessary.[10]  Also, notwithstanding the Court's anticipated

---

[8]Counsel were assisted in this effort by the Annual Reports the Department of Health and Human Services and the Department of Justice publish regarding the Health Care Fraud and Abuse Control Program (HCFAC).  These annual reports provide information regarding the results of numerous prosecutions under the HCFAC Program.  The reports are made available online at: http://oig.hhs.gov/reports-and-publications/hcfac/index.asp., and are cited as "[year] Annual Report."  Counsel found additional information regarding these and other health care fraud prosecutions through newspaper and online reports and review of court dockets and pleadings in criminal cases.

[9]In many cases, the only source of information regarding loss amount was the amount of restitution the defendant was ordered to pay.  Because intended loss may exceed actual loss in health care fraud cases, the loss figures provided in the spreadsheet may understate intended loss as determined at sentencing.

[10]Many of the cases involve wholly fraudulent conduct.  A few examples illustrate the differences between such cases and this one:

ruling that it will utilize intended rather than actual loss to calculate the guidelines, the Court has

indicated the importance of the fact that most if not all of the patients needed the oxygen they

received.   Accordingly, undersigned counsel respectfully submit that the most appropriate manner

of comparing this case to others is to view this case as one involving a loss of less than $1 million,

---

- The owner of a DME company who was sentenced to 108 months "billed Medicare approximately $1.1 million for power wheelchairs costing up to $7,000 each, on behalf of more than 170 beneficiaries, none of whom actually needed the wheelchairs.  At trial, elderly and disabled Medicare beneficiaries testified that individuals known as 'marketers' approached them on the street, at home or in church to get the beneficiaries to give the marketers their Medicare numbers and other personal information in exchange for free power wheelchairs.  One beneficiary, who is blind, testified he could not see to operate the wheelchair and never used it.  Another beneficiary testified that an individual purporting to be from Medicare, but who was actually associated with the DME owner and his co-conspirators, threatened to terminate the Medicare benefits of the beneficiary and her husband unless they accepted two power wheelchairs that they did not need."  2010 Annual Report at 13.

- The operator of a medical clinic was sentenced to 72 months in prison and ordered to pay $4.7 million because the "clinic paid a kickback to every patient or marketer bringing a patient to the clinic, billed for patients who never came to the clinic, and created patient files with falsified notes to support the fraudulent claims."  2009 Annual Report at 23.

- A defendant was sentenced to 52 months and ordered to pay $3.9 million in restitution because he "set up a series of medical clinics that existed in name only."  The scheme involved obtaining "identity information of actual doctors and Medicare patients" and using that information "to bill Medicare for infusion therapy services that were not rendered." 2009 Annual Report at 23-24.

- A pharmacist whose pharmacy had contracts to provide prescription drugs to patients in long term care facilities was sentenced to 33 months and ordered to pay over $2 million in restitution because he "had his company submit claims for payment to the Medicaid program for refilling prescriptions that, in fact, had not been refilled, delivered, or even requested" by the facilities.  2005 Annual Report at 12.

28

as that more appropriately captures the true harm potentially caused by the offense and the defendant's true culpability.[11]

Turning to an analysis of the other health care fraud sentences, the first significant fact that stands out is that the overwhelming majority of defendants where the loss is $1 million or less receive sentences of five years or less. *See* Ex.2. Second, there are a handful of cases that, while not directly analogous, involved at least some significant portion of the goods or services actually being provided, but they were fraudulently billed for because they were upcoded, not covered, or provided by unlicensed persons. Defendants in these few cases have typically received sentences of roughly five years or less. Ex.2. For example, the doctor in *United States v. Hoffman-Vaile* systematically overbilled Medicare for several years by seeking reimbursement at a higher code than was justified for the procedures she performed, causing a loss of at least $543,000.[12] Hoffman-Vaile's sentence for health care fraud was 60 months.[13] In another case, a DME company, the company's owner, and its medical director participated in a scheme to fraudulently bill Medicare "for providing power wheelchairs to beneficiaries who did not qualify for the chairs."[14] The DME company was ordered to pay $809,169 in restitution, the owner was sentenced to 18 months and ordered to pay $200,000 in restitution, and the medical director was sentenced to three months home

---

[11]It is undisputed that BMS provided each and every service they billed Medicare for. Mr. Bane will be prepared to demonstrate at the sentencing hearing that the amount Medicare paid for services that may not have been medically necessary was significantly less than $1 million.

[12]568 F.3d 1335, 1337-1340 (11th Cir. 2009).

[13]*Id.* at 1340.

[14]2010 Annual Report at 29.

detention and ordered to pay $200,000 in restitution.[15]  Thus, looking at cases involving payments for unnecessary or fictitious services of less than $1 million, and those cases involving only partial frauds, sentences rarely exceed five years. Ex.2.

A third observation to draw from the list of other health care fraud cases is that a sentence within the advisory Guidelines range, at either level 42 or level 32, would be disproportionate.   At the low end, an offense level 32 calls for a sentence of 121 months.  The majority of sentences at or above that range involve at least one of two factors: (1) loss figures in the tens or hundreds of millions of dollars; or (2) conduct that was affirmatively harmful to patients. Ex.2.  For example, a defendant who was sentenced to 360 months was the operator of a group home for mentally ill patients who was convicted not only of health care fraud, but also of involuntary servitude and forced labor because he forced patients to perform manual farm labor in the nude and to participate in therapy sessions that involved sexually explicit acts, and videotaped those acts.[16]  Other conduct that has been deemed to merit sentences at a level 32 or higher includes two different cases in which physicians falsely told patients they had cancer and performed unnecessary surgery;[17] three cases in which physicians provided patients payoffs in the form of medically unnecessary controlled substances, in two of which patients overdosed and died;[18] two cases in which HIV/AIDS patients were provided an unnecessary – but highly reimbursed – infusion treatment that had serious

_____

[15]*Id.*

[16]*See* 2006 Annual Report at 18-19; Department of Justice, *Kansas Couple Convicted on Involuntary Servitude Charges for Abusing Mentally Ill Patients*, (Nov. 7, 2005), available at http://www.justice.gov/opa/pr/2005/November/05_crt_599.html.

[17]2008 Annual Report at 13.

[18]2010 Annual Report at 14; 2006 Annual Report at 17, 18.

potential side effects,[19] and a case in which an oncologist administered diluted chemotherapy drugs to unsuspecting cancer patients.[20]  No case was located in which a sentence of ten years or more was imposed based on conduct that bears any reasonable resemblance to the facts here.  Moreover, a sentence of four years falls squarely within the range of health care fraud sentences imposed on those with leadership roles where the extent of medically unnecessary services did not exceed $1 million.

### E.    Factor Six: The Need to Avoid Unwarranted Disparities

In determining an appropriate sentence, the Court should take into account "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." § 3553(a)(6).  The requested sentence of four years would further this purpose of sentencing.  Mr. Bane may be viewed by the Court as the most culpable participant in this matter, but to date every other participant has been sentenced to probation. The requested sentence of four years would cause no unwarranted disparities with any of Mr. Bane's co-defendants.  Sentences on the order of the magnitude suggested by the PSR would present extreme unwarranted disparity.

### F.    Factor Seven: The Need to Provide Restitution

Mr. Bane objects to the restitution figures suggested in the PSR because they includes funds paid by Medicare and Medicaid for services that were both medically necessary and actually provided.  The Court's potential determination that Mr. Bane receives no credit against loss for guidelines purposes pursuant to Application Note 3(F)(v) has no application in a restitution context, which is governed by 18 U.S.C. § 3663A and not the Sentencing Guidelines.

---

[19]2010 Annual Report at 11; 2009 Annual Report at 11.

[20]2006 Annual Report at 17.

A fundamental principle of federal restitution law is that restitution may only be ordered for actual out of pocket losses suffered by the victim where the defendant was the "but for" cause of the loss. *United States v. Liss*, 265 F.3d 1220, 1231 (11th Cir. 2001) (reversing restitution award in Medicare kickback case because no showing of lack of medical necessity). The requirement of "but for" causation means that "restitution should not be ordered if the loss would have occurred regardless of the defendant's misconduct underlying the offense of conviction." *United States v. Cutter*, 313 F.3d 1, 7 (1st Cir. 2002); *see also United States v. Robertson*, 493 F.3d 1322, 1334 (11th Cir. 2007) (restitution appropriate only where "loss would not have occurred but for the conduct underlying the offense of conviction"). That is, if Medicare would have paid for oxygen for these patients even if they had not been patients of BMS, restitution may not be ordered. If BMS had not existed these patients would presumably have gotten the oxygen they needed from another DME. In the absence of a demonstration of lack of medical necessity, restitution to Medicare cannot be ordered. *Liss*, 265 F.3d at 1231-32.

Finally, given that the government is the victim entitled to restitution, if any, any funds forfeited by Mr. Bane must be credited against any restitution award to prevent a double recovery. *United States v. Ruff*, 420 F.3d 772, 775-76 (8th Cir. 2005). Given the amount of the forfeiture sought by the government, this means that an additional but smaller restitution award in favor of the government would be something of a moot point and thus not worth the difficulty of determining. *See* 18 U.S.C. § 3663A(c)(3)(B).

## III.    Conclusion

For the above reasons, Mr. Bane requests a sentence of 48 months or less.

Respectfully submitted,

/s/ James E. Felman
James E. Felman, FL. Bar No. 775568
jfelman@kmf-law.com
Katherine Earle Yanes, FL. Bar No. 0159727
kyanes@kmf-law.com
KYNES, MARKMAN & FELMAN, P.A.
Post Office Box 3396
Tampa, FL 33601-3396
Telephone:     (813) 229-1118
Facsimile:     (813) 221-6750

Attorneys for Defendant Ben Bane

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on August 17, 2011, I electronically filed the foregoing with

the Clerk of the Court which will send a notice of electronic filing to all counsel of record.

/s/ James E. Felman
James E. Felman

33